NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12032


FREDERICK CLAY  vs.  MASSACHUSETTS PAROLE BOARD.



Suffolk.     April 7, 2016. - August 12, 2016.

Present:  Gants, C.J., Cordy, Botsford, Duffly, Lenk, & Hines,
JJ.[1]



Parole.  Constitutional Law, Parole, Ex post facto
    law.  Imprisonment, Parole.  Practice, Criminal, Parole.




Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on November 20, 2015.

The case was reported by Botsford, J.


Jeffrey Harris for the petitioner.
Jennifer K. Zalnasky, Assistant Attorney General, for the
respondent.
Barbara Kaban, for Youth Advocacy Division of the Committee
for Public Counsel Services & another, amici curiae, submitted a
brief.


CORDY, J.  In 1981, the petitioner, Frederick Clay, was

convicted of murder in the first degree.  The victim was a

Boston taxicab driver.  When the crime was committed in 1979,

_____

[1] Justice Duffly participated in the deliberation on this
case prior to her retirement.

Clay was a juvenile. He was sentenced to serve the statutorily mandated term of life in prison without the possibility of parole, see G. L. c. 265, § 2, which conviction and sentence we affirmed on appeal.[2] See Commonwealth v. Watson, 388 Mass. 536, 548 (1983), S.C., 393 Mass. 297 (1984).

More than thirty years later, we determined that G. L. c. 265, § 2, which mandated Clay's sentence of life in prison without the possibility of parole, was invalid as applied to those, like Clay, who were juveniles when they committed murder in the first degree. See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 667 (2013), S.C., 471 Mass. 12 (2015), adopting Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012) (Eighth Amendment to United States Constitution and art. 26 of Massachusetts Declaration of Rights forbid sentencing schemes mandating life in prison without possibility of parole for juvenile offenders).[3] The result was that any juvenile offender who had been convicted of murder in the first degree, including Clay, became eligible for parole within sixty days before the expiration of fifteen years of his or her life sentence. See Diatchenko, supra at 666, 673; Commonwealth v. Brown, 466

---

[2] The full factual background concerning Frederick Clay's conviction is set forth in our opinion affirming his conviction. See Commonwealth v. Watson, 388 Mass. 536, 548 (1983).

[3] General Laws c. 265, § 2, has since been amended to reflect our decision. See G. L. c. 127, § 133A, as amended through St. 2014, c. 189, § 3.

Mass. 676, 689 (2013) (under doctrine of severability, statute read "as if omitting the exception for parole eligibility for murder in the first degree when applying the statute to juveniles").  See also G. L. c. 127, § 133A.

Clay, having already served more than fifteen years of his sentence, became immediately eligible to be considered for parole and appeared before the parole board on May 21, 2015.  Of the seven participating members on the panel, four voted in favor of parole.  The parole board, however, was "unable to grant a parole permit" because, pursuant to a 2012 amendment to G. L. c. 127, § 133A (§ 133A), a parole permit can only be accomplished "by a vote of two-thirds" of the parole board members on the panel.  See G. L. c. 127, § 133A, as amended through St. 2012, c. 192, § 39 (supermajority amendment).[4]  Prior to the adoption of the supermajority amendment, § 133A required only "a vote of a majority" of the parole board members on the panel.  See G. L. c. 127, § 133A, as amended through St. 1973, c. 278.  The previous version of § 133A was in effect in 1979 when Clay committed his crime.

---

[4] The preamble of the "Act relative to sentencing and improving law enforcement tools," of which the amended G. L. c. 127, § 133A, is a part, makes clear that the policy rationale behind the supermajority amendment was punitive, as it sought "to strengthen forthwith the laws relative to habitual offenders, update sentencing laws and to provide additional law enforcement tools."  See St. 2012, c. 192.

Clay requested an administrative appeal from the decision of the parole board, arguing that the application of the supermajority amendment to his parole determination, rather than the version that was in effect at the time he committed the crime, operated as an unconstitutional ex post facto violation. See art. I, §§ 9, 10, of the United States Constitution; art. 24 of the Massachusetts Declaration of Rights. The request was denied. Clay then filed a petition for declaratory relief, pursuant to G. L. c. 231A, or relief in the nature of certiorari under G. L. c. 249, § 4, in the county court. A single justice reserved and reported the case for determination by the full court.

We now consider whether (1) the amended § 133A, imposing a supermajority requirement on decisions to grant parole, was applied retroactively to Clay; and, if it was, (2) whether such retroactive application is an ex post facto violation, either on its face or as applied to Clay. After answering the first question in the affirmative, we conclude that, because Clay is able to show, by presenting evidence in the form of a parole board decision, that he received affirmative votes from a majority of the members but was denied parole under the

supermajority amendment, such amendment is, as applied to him, an ex post facto violation.[5]

Discussion. The United States Constitution and the Massachusetts Declaration of Rights provide protection from the operation of ex post facto laws. See Commonwealth v. Kelley, 411 Mass. 212, 214 (1991). See also Police Dep't of Salem v. Sullivan, 460 Mass. 637, 644 n.11 (2011) ("We interpret the ex post facto clause of the State Constitution to be coextensive with that of the Federal Constitution"). The ex post facto clause is intended to prohibit laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." Collins v. Youngblood, 497 U.S. 37, 43 (1990). See Opinion of the Justices, 423 Mass. 1201, 1225 (1996) ("Does the statute change[] the punishment, and inflict [] a greater punishment, than the law annexed to the crime, when committed?" [quotation omitted]). One category of prohibited laws are those that, when applied retroactively, "enhance[] the possible penalty for a crime committed when an earlier version of the statute was in effect." Brown, 466 Mass. at 689 n.10, citing Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798). Retroactive changes that apply to the denial of parole are a proper subject for application of the ex post facto clause.

---

[5] We acknowledge the amicus brief submitted by the Youth Advocacy Division of the Committee for Public Counsel Services and Citizens for Juvenile Justice.

See, e.g., Garner v. Jones, 529 U.S. 244, 250 (2000); California Dep't of Corrections v. Morales, 514 U.S. 499, 509 (1995); Fender v. Thompson, 883 F.2d 303, 305 (4th Cir. 1989) ("parole eligibility is part of the law annexed to the crime at the time of a person's offense" [citation omitted]); Brown, supra at 688-689; Stewart v. Chairman of the Mass. Parole Bd., 35 Mass. App. Ct. 843, 845 (1994). See also Weaver v. Graham, 450 U.S. 24, 29-30 (1981) (statute presenting significant risk of depriving individual of opportunity to shorten time in prison may also violate ex post facto doctrine); United States ex rel. Steigler v. Board of Parole, 501 F. Supp. 1077, 1080 (D. Del. 1980) ("the possibility of parole is part and parcel of the punishment for a crime").

To prevail on an ex post facto claim, a litigant "must show both [(1)] that the law he challenges operates retroactively (that it applies to conduct completed before its enactment) and [(2)] that it raises the penalty from whatever the law provided when he acted." Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 618 (2011), citing Commonwealth v. Cory, 454 Mass. 559, 564 (2009).

1. Retroactivity. The murder for which Clay is serving a life sentence was committed in 1979. At that time, § 133A required positive votes from a majority of the parole board members for a grant of parole. See G. L. c. 127, § 133A, as

amended through St. 1973, c. 278.  In 2012, the Legislature amended § 133A to require positive votes from two-thirds of the parole board panel members.  See G. L. c. 127, § 133A, as amended through St. 2012, c. 192, § 39.  It was pursuant to the amended version that the parole board determined Clay would not be granted parole, as he received only four positive votes from the seven board members.[6]  Section 133A was, therefore, "applie[d] to conduct completed before its enactment," and "has a retrospective application to [Clay]."  Cory, 454 Mass. at 564-565, citing Opinion of the Justices, 423 Mass. at 1225.  See Miller v. Florida, 482 U.S. 423, 430 (1987), quoting Weaver, 450 U.S. at 31 ("A law is retrospective if it 'changes the legal consequences of acts completed before its effective date'").

2.  Enhanced penalty.  The controlling inquiry as to whether the retroactive application of a law affecting parole constitutes an ex post facto violation is whether such application "creates a significant risk of prolonging [an individual's] incarceration."  Garner, 529 U.S. at 251, citing Morales, 514 U.S. at 509 (whether application creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes").  An individual may establish the

---

[6] The parole board noted in its decision on Clay's parole application:  "The two-thirds majority consensus did not occur in Clay's case.  Accordingly, parole is denied, with a review in one year from the date of the hearing."

"significant risk" prong in either of two ways. First, the individual may demonstrate that the amendment is facially unconstitutional, meaning it "by its own terms show[s] a significant risk" of prolonging his or her incarceration. Garner, supra at 251, 255. Or, second, the individual may "demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." Id. at 255. See id. at 251 ("requisite risk" can either be "inherent in the framework of amended [statute or] demonstrated on the record").

Under either analysis, "not every retroactive procedural change creating a risk of affecting an [individual's] terms or conditions of confinement is prohibited," Garner, 529 U.S. at 250, and whether such a retroactive application qualifies as an ex post facto violation is a "matter of 'degree'" (quotations omitted), Morales, 514 U.S. at 509, quoting Beazell v. Ohio, 269 U.S. 167, 171 (1925). See Commonwealth v. Bargeron, 402 Mass. 589, 594 (1988) ("Statutes relating merely to the remedy or procedure which do not affect substantive rights are generally held to operate retroactively" [quotation omitted]). See also Weaver, 450 U.S. at 31 ("it is the effect, not the form, of the law that determines whether it is ex post facto"). Because

the Legislature "must have due flexibility in formulating parole procedure and addressing problems associated with confinement and release," there is no "single formula for identifying which legislative adjustments, in matters bearing on parole, would survive an ex post facto challenge."  Garner, supra at 252.  See Morales, supra.

The Supreme Court has deemed unconstitutional the retroactive application of parole laws where the increase in punishment is certain and demonstrable.  See Lynce v. Mathis, 519 U.S. 433, 446-447 (1997).  In Lynce, the petitioner had earned early release from prison based on the accrual of credits.  Id. at 438.  That year, the Florida Legislature canceled the credit program for certain classes of incarcerated individuals, including that of the petitioner.  Id. at 438-439.  As a result, the petitioner's credits were rescinded, rearrest warrants were issued, and the petitioner was returned to prison.  Id. at 439.  The United States Supreme Court determined that the statute "unquestionably disadvantaged petitioner because it resulted in his rearrest and prolonged his imprisonment."  Id. at 446-447.  It "did more than simply remove a mechanism that created an opportunity for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible -- including some, like petitioner, who had

actually been released" (emphasis in original).  Id. at 447.
Such application was therefore an ex post facto violation.  Id.

On the other hand, where retroactive application of a parole law creates only a speculative or conjectural risk of prolonging incarceration, the Court has refused to hold such law unconstitutional.  See Garner, 529 U.S. at 255-257 (remanding case for further consideration whether retroactive application of amendment created "significant risk of increased punishment for [the individual]," because record revealed only "speculation"); Morales, 514 U.S. at 509.  The litigant in Morales challenged the retroactive application of a law that allowed the California parole board the discretion to set an interval longer than the previously required one-year waiting period between parole hearings.  Morales, supra at 503-504. Because the risks associated with the application of the amendment were merely "conjectural" and produced a "remote" likelihood of affecting the release of the affected prisoners, the Court found that "[t]he amendment create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes."  Id. at 508-509.  The Court therefore reversed the judgment of the United States Court of Appeals for the Ninth Circuit that the amendment violated the ex post facto clause.  Id. at 514.

3.  Facial challenge to G. L. c. 127, § 133A.  We first consider whether the supermajority amendment is, on its face, an unconstitutional ex post facto violation.  We conclude that it is not, as a facial attack on the supermajority amendment to § 133A fails to establish that there is a significant requisite risk inherent in its framework.  Garner, 529 U.S. at 255.

Under Massachusetts law, the parole board has discretionary authority to grant parole.  See G. L. c. 27, § 5 ("The parole board shall . . . within its jurisdiction . . . determine which prisoners . . . may be released on parole, and when and under what conditions, and the power within such jurisdiction to grant a parole permit to any prisoner, and to revoke, revise, alter or amend the same . . .").  Under the parole board's discretionary authority pursuant to G. L. c. 27, § 5, no one is guaranteed a grant of parole.  See Diatchenko, 466 Mass. at 674.  The disposition of the facial challenge, then, will rest on whether or not the supermajority amendment to the discretionary power of the parole board to grant parole "increases, to a significant degree, the likelihood or probability of prolonging [an individual's] incarceration."  Garner, 529 U.S at 256.

We are not convinced that the inherent effect of the supermajority amendment creates a significant risk of increased punishment for covered individuals.  See Garner, supra at 251.  Absent the parole board's decision as to Clay's parole

application and the apparent effect on it of the supermajority amendment, we are presented with nothing beyond speculation and conjecture that the supermajority amendment to § 133A would "increas[e] the measure of punishment attached to the covered crimes." Morales, 514 U.S. at 514. The supermajority amendment to § 133A applies only to a class of individuals (those sentenced to life in prison) for whom the probability of release on parole, particularly as part of an initial hearing, is very low.[7] Indeed, Clay acknowledges in his reply brief that only one other person has, since the enactment of the supermajority

---

[7] In 2011, the parole board heard twenty-eight initial life sentence parole hearings. See Massachusetts Parole Board, 2011 Annual Statistical Report, at 15 (2011 Report), http://www.mass. gov/eopss/docs/pb/paroleboard2011annualstatisticalreport.pdf [https://perma.cc/6PFY-2W33]. Of those twenty-eight hearings, conducted prior to the supermajority amendment to G. L. c. 127, § 133A, four yielded permits (fourteen per cent). Id. In 2012, during which, on August 2 of that year, the supermajority requirement went into effect, there were twenty-six initial hearings, yielding five positive parole votes (nineteen per cent). See Massachusetts Parole Board, 2012 Annual Statistical Report, at 33 (2012 Report), http://www.mass.gov/eopss/docs/pb/ 2012annualstatisticalreport.pdf [https://perma.cc/9U2M-7GSE]. In 2013, the most recent year on record (and during which every hearing was conducted pursuant to the supermajority requirement), there was a positive vote rate of five out of twenty-three (twenty-two per cent). See Massachusetts Parole Board, 2013 Annual Statistical Report, at 31 (2013 Report) http://www.mass.gov/eopss/docs/pb/2013annualstatisticalreport. pdf [https://perma.cc/YUK8-MW4V]. These statistics indicate not only that the probability of parole on an initial hearing for individuals sentenced to life in prison is very low, but also that the supermajority amendment has not had any negative effect on the chances of receiving a positive parole vote. The same holds true for review hearings. See 2011 Report, supra; 2012 Report, supra; 2013 Report, supra.

amendment, been denied parole after receiving four favorable votes.  See Alston v. Robinson, 791 F. Supp. 569, 591 (D. Md. 1992) (facial ex post facto challenge to amendment requiring higher percentage of votes in favor of parole alone, without direct evidence from persons affected, failed because it did "not substantially alter [those individuals'] 'quantum of punishment' and thus, does not violate the ex post facto clause" [citation omitted]).  While "[t]he presence of discretion does not displace the protections of the [e]x [p]ost [f]acto [c]lause," Garner, supra at 253, the supermajority amendment is not, on its face, unconstitutional.

4.  As applied.  We next consider whether the supermajority amendment is an ex post facto violation as applied to Clay. See Garner, 529 U.S. at 255 ("When the rule does not by its own terms show a significant risk, the [litigant] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule").  The parole board's decision denying Clay's application for parole is evidence that, but for the supermajority amendment, Clay would have been granted parole.  The majority (four members) "voted to parole Clay to a long term residential treatment program after successful completion of one year in lower security."  However,

because "[t]he two-thirds majority consensus did not occur in Clay's case . . . , parole [was] denied."  That is clear evidence, "drawn from the rule's practical implementation by the agency charged with exercising discretion," id., that the supermajority amendment's application rendered Clay "ineligible for early release," Lynce, 519 U.S. at 447.  The retroactive application therefore "result[ed] in a longer period of incarceration than under the earlier rule."  Garner, supra.

This is not a case in which the risk of increased punishment is merely a "speculative and attenuated possibility," Morales, 514 U.S. at 509:  had Clay received a favorable vote from four members of the parole board prior to the supermajority amendment, he would have been granted parole. Instead, he remains in prison.  The supermajority amendment therefore no longer simply poses the requisite "significant risk of prolonging [Clay's] incarceration," Garner, 529 U.S. at 251, quoting Morales, 514 U.S. at 509; such risk is, for Clay, already a reality.[8]  See Lynce, 519 U.S. at 447 n.17 (amendment

---

[8] While we recognize that Clay's parole eligibility is conditioned on a successful completion of one year at a lower security institution, our review of the parole hearing decisions, see Official Web site of the Executive Office of Public Safety and Security, Public Safety, Massachusetts Parole Board Decisions, http://www.mass.gov/eopss/agencies/parole-board/lifer-records-of-decision.html, reveals that such a designation has become commonplace prior to full release on parole.  It therefore does not affect our analysis, as such prerelease conditions are a step in the parole process.  In any

"chang[es] . . . the quantum of punishment attached to the crime" [citation omitted]); <u>Barton</u> v. <u>South Carolina Dep't of Probation Parole & Pardon Servs</u>., 404 S.C. 395, 399, 419 (2013) (increase in requisite votes needed for parole applied retroactively deemed unconstitutional as an ex post facto violation).[9,10]

---

event, Clay's preclusion from a lower security institution still constitutes a "raise[d] . . . penalty" (citation omitted). <u>Doe, Sex Offender Registry Bd. No. 1080</u> v. <u>Sex Offender Registry Bd</u>., 459 Mass. 603, 618 (2011).

[9] The parole board seems to suggest that the risk as to prolonged punishment is speculative because the parole board members may have voted differently had they known that a majority vote would have been sufficient to establish release. Because we presume that the parole board members are voting in good faith and without the other members' votes in mind, see 120 Code Mass. Regs. § 300.04 (1997) ("Parole Board Members shall only grant a parole permit if they are of the opinion that there is a reasonable probability that, if such offender is released, the offender will live and remain at liberty without violating the law and that release is not incompatible with the welfare of society"), we assume that the votes would be the same regardless of the threshold for parole. See <u>Garner</u> v. <u>Jones</u>, 529 U.S. 244, 256 (2000) ("Absent a demonstration to the contrary, we presume the [b]oard follows its statutory commands and internal policies in fulfilling its obligations").

[10] We acknowledge the decision of the Arizona Court of Appeals in <u>State ex rel. Gonzalez</u> v. <u>Superior Court</u>, 184 Ariz. 103, 105 (Ct. App. 1995) (<u>Gonzalez</u>). The issue decided in that case is similar to the one we face in the present case: an incarcerated individual was sentenced when a majority vote of the three-member quorum of the Arizona parole board warranted parole. <u>Id</u>. at 103. Before he came before the board, the Legislature passed a statute requiring that any three-member panel unanimously approve parole. <u>Id</u>. at 104. The individual received two of three votes, and his parole was denied. <u>Id</u>. Despite acknowledging that procedural changes could still constitute ex post facto laws, <u>id</u>. at 105, the court, relying on

   Conclusion.  The retroactive application of the
supermajority amendment constitutes an ex post facto violation.
Clay received the necessary four out of seven votes from the
parole board panel required by the version of § 133A in effect
at the time he committed murder in the first degree, and he
should therefore be granted parole.  The parole board's decision
is reversed, and we remand the case for proceedings consistent
with this opinion.[11]

                           So ordered.

-----

Collins v. Youngblood, 497 U.S. 37, 42 (1990), held that the
amendment was "clearly procedural in nature and [did] not alter
the criteria that the [b]oard applies in determining parole
eligibility."  Gonzalez, supra.  Therefore, because it had "not
newly criminalized his acts, enhanced his punishment, or altered
the legal rules of evidence as they appl[ied] to his case," the
retroactive application did "not violate ex post facto
constitutional principles."  Id.  Gonzalez was decided without
the benefit of Garner, Morales, and, in particular, Lynce.  The
United States Supreme Court, in Lynce, which was decided two
years after Gonzalez, made clear that retroactively prolonging a
term of imprisonment and rendering an individual ineligible for
release may be sufficient to establish an ex post facto
violation.  See Lynce v. Mathis, 519 U.S. 433, 447 (1997).

[11] Because we conclude that Clay is entitled to parole based
on the unconstitutional ex post facto violation, we need not, as
he invites us to do, consider the impact of his interim period
of incarceration without the possibility of parole on his ex
post facto claim.